UNITED STATES of America,
Plaintiff-Appellee,

v.

Ben Lee BASEY, Armando Jose Lopez, and Oscar Quirarte Ponce, Defendants-Appellants.

No. 86–1308.

United States Court of Appeals,
Fifth Circuit.

April 28, 1987.

Rehearing Denied May 28, 1987.

Scott Young, Warren L. Collins, Jr., Austin, Tex., for Basey.

Robert J. Kuhn, Austin, Tex., court-appointed, for Ponce.

David L. Shapiro, Austin, Tex., court-appointed, for Lopez.

Thomas Booth, Dept. of Justice, Appellant Section, Cr. Div., Washington, D.C., Helen M. Eversberg, U.S. Atty., Michael R. Hardy, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GARWOOD, JOLLY, and HILL, Circuit Judges.

GARWOOD, Circuit Judge:

Three defendants appeal their convictions, following a joint jury trial, on charges that they conspired to possess more than fifty kilograms of marihuana with the intent to distribute it, and individual charges of drug possession. Appellant Ben Lee Basey (Basey) was stopped by law enforcement officers investigating a burglary in an isolated, rural area of Burnet County, Texas. Basey claims that the stop was unlawful, that his arrest was pretextual, and that he was therefore subjected to an improper search. Basey urges the suppression of all evidence flowing from these events. He also claims that evidence was insufficient to show he possessed the 1,700 pounds of marihuana found in an abandoned van about two miles from the site of his arrest.

The other two appellants—defendants Oscar Quirarte Ponce (Ponce) and Armando Jose Lopez (Lopez)—were arrested in a motel in Austin, Texas, some twenty-eight

hours after, and about forty miles from the scene of, Basey's arrest. Both attack the sufficiency of evidence linking them to the marihuana conspiracy. Lopez and Ponce each also protest the admission of Basey's postarrest statements on Sixth Amendment grounds and claim that the district court erred in denying their motions for severance. Ponce further complains of the denial of his motion to quash the entire venire on the ground of prior jury service and the admission of Lopez' postarrest statements; and he also challenges the sufficiency of evidence supporting his conviction of possession of marihuana found in a nightstand in the motel room.

We determine that the issues raised by Basey and Lopez lack merit and affirm their convictions. We conclude that Ponce was properly convicted of possessing the marihuana found in the motel nightstand and affirm that conviction, but we hold that evidence was insufficient to prove his participation in the charged conspiracy beyond a reasonable doubt, and accordingly reverse his conviction on that count.

## I.

The facts of this case involve events in two locations: Burnet County, where Basey was arrested, and Austin, where Ponce and Lopez were found in a motel.

### A. Events in Burnet County

█ On the evening of September 5, 1985, a resident of a rural area of Burnet County, David Naumann, reported to the sheriff's office that his house near the town of Spicewood had been burglarized while he was at work that day.[1] Two county sheriff's deputies (Reinhardt Reeh and Randy Meeks) were on routine patrol near the town of Marble Falls when they received a message from the office dispatcher advising them to investigate the complaint. Deputy Reeh testified that the dispatcher informed them that "a particularly

suspicious vehicle" had been seen in the area by Naumann and his neighbors, "gave a description of the vehicle and gave us the license plate number," and indicated that the car had last been seen heading in the direction of Marble Falls on Double Horn Road. Deputy Reeh said that Naumann had worked for several years at a small store three to four miles from his home and consequently "he knows almost every person in that community" and was familiar with the vehicles of local residents.

The deputies headed towards Naumann's home on Double Horn Road, arriving around 9:00 p.m., some ten minutes after receiving the dispatcher's message, without having spotted the vehicle in question. Deputy Reeh testified that, shortly after the deputies arrived, he heard the sound of a "low-flying aircraft," which he thought was landing at or possibly taking off from an airstrip he knew was on the Blagg ranch about two miles away.

Naumann and some of his neighbors met the deputies. Naumann told the deputies that seven firearms were among the missing items, and he and his neighbors said they had seen an unfamiliar car "driving up and down the road" earlier that day. Naumann also reported that just before he arrived home from work that evening and discovered the burglary, he had seen the same car "almost at a stop just down from his gate." Naumann said he had talked to the driver, who claimed to be looking for a woman's house, and that the driver had then driven away on Double Horn Road. Reeh testified that, after the deputies said they had not seen the vehicle, Naumann stated that the vehicle must have gone onto the Blagg Ranch. The record suggests that Naumann had reported the burglary promptly and that only about fifteen minutes elapsed between the time Naumann saw the unfamiliar car near his house on

---

1. In sustaining the denial of a motion to suppress, this Court may consider not only the evidence from the suppression hearing but also evidence presented during the trial. *United States v. Quiroz-Carrasco,* 565 F.2d 1328, 1330 (5th Cir.1978).

Testimony at the suppression hearing and at trial about the events surrounding Basey's arrest came solely from the deputies; Naumann did not testify.

his arrival home from work and the time of the deputies' arrival.

About fifteen minutes after the deputies had arrived and while they were conversing with Naumann, a car came down the road from the direction of the Blagg Ranch. A pickup truck was following the car. Naumann told the deputies that he believed that the passing car he was observing—described as a yellow or cream-colored 1980 Ford sedan—was the same one he had seen earlier near his gate just before he discovered the burglary.[2]

The deputies followed and stopped the car. Reeh told the driver, Basey, who had stepped out of the vehicle, that they were investigating the burglary of Naumann's home and asked Basey to produce his driver's license. The license disclosed Basey resided in Arlington, Texas (between Dallas and Fort Worth). Basey explained his presence by claiming he was looking for the home of a woman he had met in a bar, giving a name—Susan Harris—unknown to the officers, and revealed that he had neither directions to nor a phone number for this woman's home. Basey also stated that he had borrowed the car he was driving from a friend.

Basey was asked to show proof that he carried adequate liability insurance for the car, which he could not do. Basey was then read his rights and arrested for not complying with Texas' financial responsibility statute, which requires drivers to obtain at least the prescribed minimum levels of liability insurance on vehicles they drive and to carry some proof of this insurance coverage. Deputy Meeks then asked Basey's permission to look into the vehicle's trunk, which Basey granted, and the deputies found that the trunk contained only a spare tire and tire tools. In the passenger compartment, however, the deputies saw two "Handi-Talkie" portable radios and a

citizen's band (CB) radio handset, and they observed that at least one radio was set on CB Channel 16 and that a Handi-Talkie radio was tuned to frequency 122.90. Government witnesses later testified that frequency 122.90 is used as an aircraft communications frequency.

One of the radios was already switched on, and Deputy Meeks spoke into its microphone and asked if anyone was listening. A voice answered and asked Meeks if he was "the Spiderman." Meeks said that he was and tried to arrange a meeting with the unknown voice, but there was no reply. Another officer was called to take custody of Basey, and a wrecker was summoned to impound his car. Deputies Meeks and Reeh returned to Naumann's home, where they were told that Naumann's neighbors had seen another suspicious vehicle—a white Ford van—in the area. Meeks testified that Reeh told him to continue to search the surrounding area for vehicles that might have been involved in the burglary. Meeks drove towards the Blagg Ranch airstrip and, about two miles from where Basey had been arrested, spotted a white van parked partially hidden in a cluster of cedar trees off the road.

The van's windows were open, and its engine was still warm. Four radios were in the front of the van. One or more of the radios were set to CB Channel 16, and a Handi-Talkie radio was tuned to frequency 122.90. At least one Handi-Talkie and one CB were of the same brand and model as those found in Basey's car. The back of the van was stuffed full of baled marihuana, a cargo later determined to weigh some 1,700 pounds. Additional officers were called to the scene and the van was impounded.

Basey was taken to and processed at the Burnet County jail. His effects taken into police custody when he was booked includ-

---

2. These events occurred near 9:00 p.m., when, according to the deputies, night had already fallen; one of the deputies estimated the distance to the car at "I would say 100 or 150 yards, just guessing." However, the deputies' testimony that Naumann identified the car and that Basey's car was the same car observed in the area earlier was uncontroverted. The de-

fendants did not claim at the suppression hearing, at trial, or on appeal that conditions made it unlikely that Naumann could identify the car on the nearby road or that the vehicle was not illuminated by the headlights of the pickup which followed it or by some other source of artificial light. *See United States v. McKenzie,* 768 F.2d 602, 605 (5th Cir.1985).

ed his personal telephone book, which listed the name Armando Lopez, and two scraps of paper, one containing the numbers "441 0143" and "115," the other the name "Danielle Ann Fields." The next day, September 6, Basey was arraigned on state drug charges and again advised of his constitutional rights. Around noon, Burnet County Sheriff's Department criminal investigations officer Bob Simpson interrogated Basey.[3] Simpson also contacted the federal Drug Enforcement Administration (DEA) and the Texas Department of Public Safety (DPS) for assistance in investigating the case and provided officers from these agencies the originals and copies of the documents found in Basey's possession.

About 5:30 p.m. on the same day as Simpson's interrogation, DEA Agent Javier Pena administered *Miranda* warnings to Basey again and questioned Basey after informing him that no specific promises of help were being offered. Basey described the general scheme of marihuana trafficking without stating whether he was involved in it. He said the marihuana came from Guadalajara, Mexico, and that a large organization with a ground crew of seven or eight people had brought between forty to fifty tons of marihuana into the United States during each of the preceding four or five years. He named the alleged head of the group and two members, none of whom were defendants in this case.

### B. Events at the Austin Motel

On the evening of September 6, after Basey's interrogation, Robert Nesteroff, a Texas DPS narcotics investigator specializing in aircraft narcotics smuggling investigations, dialed the "441–0143" number found on Basey and reached a "Super 8" motel located in Austin, approximately forty miles southeast of the site of Basey's arrest. Nesteroff visited the motel at about 10:30 p.m. and learned that room 115 was registered in the name of an Eddie Martinez, from Fort Worth. In the motel parking lot, Nesteroff noticed a silver Chevrolet pickup truck and, in the truck's

bed, a large fuel tank, an electric fuel pump with hoses, and spare auto batteries. Nesteroff testified that he could smell "a very strong odor of aviation fuel coming from the tank." Nesteroff claimed that he could recognize the odor of aviation fuel because he worked around aircraft every day, a proposition the defendants did not challenge.

Nesteroff recorded the license plate number of the truck and then walked by room 115, where he detected "a very strong odor of burning marihuana emanating from the room" and heard laughter and more than one voice. Nesteroff sought the help of Austin police, obtained a search warrant from a state district judge, and returned with Austin police officers to execute the warrant at about 1:00 a.m. on September 7. At that time, the Chevrolet truck was no longer in the motel parking lot.

The agents arranged for the desk clerk to call room 115 and to induce an occupant to leave the room. As the officers waited outside the door, appellant Lopez emerged. The officers detained him and entered the room. In the initial search of the room, the officers found about twenty-five grams of marihuana (nine-tenths of an ounce) in a drawer of the nightstand located between the room's two beds. Lopez was then arrested. The agents searched Lopez and found a small plastic envelope containing a trace of suspected cocaine in his pants' pocket, $10,000 (mostly $10 and $20 bills) stuffed into his socks, and several business cards with numbers and addresses written on them, including Basey's home address.

The agents also awakened and arrested the room's only other occupant, appellant Ponce, who had been asleep in one of the room's beds. Ponce was told to dress, and the clothing he selected was searched before he was allowed to put it on. The officers found $1,070 (mostly $10 and $20 bills) and a piece of paper containing, among other things, the name of Danielle Fields (plus address and telephone number)

---

**3.** Statements Basey made to Officer Simpson were suppressed because the district judge concluded that Simpson, without the authority to

do so, induced Basey to believe that Simpson could and would help Basey on the charges then facing him.

and the telephone numbers of Basey and Lopez, in a pocket of the trousers Ponce indicated were his.

The officers informed Lopez and Ponce of their *Miranda* rights, instructing Ponce in Spanish when it became apparent he did not speak English. During their search of the room, the officers found the following additional items: a small block of suspected hashish in a suitcase which carried the name of a person not in the room; a backpack five feet from the bed Ponce was in containing a .45 caliber automatic pistol, a notebook with radio directional frequencies, navigational charts for Texas and Mexico, and numbers that reflected a flight route between Zacatecas, Mexico, and Fort Worth, Texas.[4] Additional flight charts for Texas and Mexico were found in a suitcase near the foot of the bed Ponce was in, and most aviation charts found in both locations bore the stamp of a Fort Worth pilot's shop.

While the search progressed, the television set which had been on at low volume when the officers first entered the room continued to operate. A news report about Basey's arrest and the Burnet County marihuana seizure came onto the television, and Lopez asked agents to turn the volume up and was attentive to the broadcast. While Lopez and Ponce were being transported to jail, Lopez asked Nesteroff, "How did you find us?" Nesteroff told Lopez about the telephone number in Basey's possession, and Lopez said, "It figures."

The government traced the title records of the various vehicles involved in this case and provided testimony at trial that the Chevrolet truck at the motel and the marihuana-laden Ford van were purchased from the same Forth Worth area seller by the same buyer, Stephen Lee. The seller of

these vehicles also owned the car which Basey was driving when he was arrested and testified that the car had been rented under the name "Basye" to a man who did not look like defendant Basey. There was no significant defense evidence.[5]

## II.

### A. The Suppression Hearing

Basey filed a pretrial motion to suppress evidence, which the other defendants joined, claiming (1) that the deputies' initial investigatory stop of Basey's car was not supported by reasonable suspicion; (2) that the radios seized from the car should be suppressed because they were taken without probable cause or, alternatively, during a pretextual field inventory; and (3) that statements Basey made after his arrest were tainted by the illegality of his arrest. During argument on the motion, Basey's attorney conceded that no motion was made to suppress evidence relating to the van or any of its contents, and stated that he believed Basey lacked standing to challenge the admission of that evidence.

The district judge denied Basey's motion on all points raised except his motion to suppress statements Basey made to Officer Simpson (see note 3, *supra*). Findings on the motion to suppress, filed one month after trial, state in pertinent part:[6]

"The stop and subsequent arrest of Ben Lee Basey was based on the reasonable suspicion of Officer Ray [*sic*] and Officer Meeks that Mr. Basey was engaged in criminal activity, since a vehicle which matched the description of Mr. Basey's vehicle was seen leaving the scene of a burglary moments earlier....

"The Court finds that Officers Ray [*sic*] and Meeks asked Mr. Basey for proof of liability insurance on the vehicle

---

4. Zacatecas is located north-northeast of Guadalajara and south-southwest of Monterey. A direct line of flight from Zacatecas to Fort Worth passes almost directly over Burnet County.

5. The only defense evidence consisted of three exhibits: an aerial photograph of the area where Basey was arrested, a photograph of Basey, and a photograph of an unidentified individual. The latter two were used in cross-exam-

ination of the owner of the car Basey drove, indicating that defendant Basey was not the "Basye" who rented it.

6. The district court also denied motions to suppress evidence discovered in the search of the motel room, raised and argued on various theories by Lopez and Ponce, neither of whom has appealed the denial of these motions.

he was driving and when he was unable to provide any proof, Mr. Basey was arrested. The Court finds the officers acted in good faith in arresting Mr. Basey for failure to provide proof of liability insurance.... Subsequent to Mr. Basey's arrest, the officers searched his vehicle and discovered several two-way radios. These items were properly seized by the officers as the search was incident to Mr. Basey's arrest.... Additionally, the officers had probable cause to believe the vehicle contained evidence of a crime. Consequently, the Court holds that the arrest of Mr. Basey was lawful and the subsequent search of his vehicle was likewise lawful." (Citations omitted.)

### B. The Trial

Basey, Ponce, and Lopez—and no others—were jointly tried on a superseding indictment and found guilty by a jury. All three were convicted of conspiring to possess with intent to distribute the more than fifty kilograms of marihuana found in the abandoned van. In addition, Basey was further found guilty of possessing that same marihuana with the intent to distribute it. Ponce was also convicted of simple possession of the 0.9–ounce of marihuana in the motel nightstand. And Lopez was also found guilty of simple possession of both the 0.9–ounce of marihuana and the cocaine residue.[7]

### III.

We examine the issues raised on appeal by each party in turn.

### A. Basey's Contentions on Appeal

The resolution of Basey's complaints on appeal depends upon four central issues: (1) the deputies' legal justification for stopping Basey's car and arresting him; (2) the admissibility of the abandoned van and its contents; (3) the admissibility of statements Basey made to Agent Pena; and (4) the sufficiency of evidence supporting Basey's conviction on the substantive offense of possessing the marihuana found in the abandoned van.

### 1. Legality of the Investigatory Stop and Subsequent Arrest

Basey asserts that the deputies' investigatory stop of his car was not supported by reasonable suspicion and was therefore unlawful. Consequently, he claims, all evidence discovered as a result of that stop, his subsequent arrest, and the search of the car he was driving is tainted and should be suppressed. This evidence includes the radios found in his car, the papers found on him, and the items found with Ponce and Lopez when they were arrested after the telephone and room numbers taken from Basey were traced. The district court ruled that the stop was a proper one based on reasonable suspicion, that the arrest of Basey was lawful, and that the search of his vehicle was a proper search incident to a custodial arrest. The issue of the propriety of the stop and arrest, and of the search of the car, is dispositive of three of Basey's complaints on appeal.

A district court's factfinding on a motion to suppress is reviewed under the clearly erroneous standard, *United States v. Duckett*, 583 F.2d 1309, 1313 (5th Cir.1978), as are the district court's findings of histor-

---

**7.** The defendants were convicted and sentenced as follows: Basey, conspiracy to possess with intent to distribute more than fifty kilograms of marihuana (21 U.S.C. § 846; twenty-five-year sentence rendered possible by status as parolee on prior drug conviction, *see id.* § 841(b)(1)(B) (enhancement provision), plus $100,000 fine), and possession with intent to distribute the marihuana in the van (*id.* § 841(a); fifteen-year sentence), with consecutive sentences totaling forty years followed by special parole for life; Ponce, conspiracy to possess with intent to distribute the 1,700 pounds (*id.* § 846; eight-year sentence), and simple possession of the 0.9 ounce of marijuana in the motel nightstand (*id.* § 844(a); one-year sentence), with concurrent sentences totalling eight years; and Lopez, conspiracy to possess with intent to distribute the 1,700 pounds (*id.* § 846; fifteen-year sentence and $25,000 fine), and two simple possession counts for the cocaine residue and marihuana found in the nightstand (*id.* § 844(a); two one-year sentences), with concurrent sentences totalling eight years. All convictions were appealed except Lopez' two simple possession convictions.

ical facts on the issue of reasonable suspicion, *United States v. Merkt*, 764 F.2d 266, 274 (5th Cir.1985) (per curiam). The ultimate determination of reasonableness in investigatory stop cases is, however, a conclusion of law. *Cf. Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Miranda-Perez*, 764 F.2d 285 (5th Cir.1985).

Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, a temporary investigative stop (a seizure of the person, *id.* at 1877 [8]) is proper if the stop is based on reasonable suspicion [9] "that criminal activity may be afoot," *id.* at 1884.[10] The *Terry* rationale also permits the investigatory detention of a vehicle. *E.g., United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). The legality of a vehicle search which takes place after the investigatory stop is a question separate from the issue of whether the stop was permissible. Accordingly, we address first the propriety of the deputies' stop of Basey's car and, then, the events which followed the investigatory

detention—Basey's arrest and the subsequent search of the car.

#### (a) The Investigatory Stop of Basey's Car

In *Adams, supra*, 92 S.Ct. at 1924, the Supreme Court rejected the theory that "reasonable cause for a stop and frisk can only be based on the officer's personal observation" and held, instead, that the proper issue was whether the information which formed the basis of a police officer's actions possessed "indicia of reliability." *Id.* As in *Adams*, the deputies in this case acted on information from a citizen they knew; in *Adams*, although the informant was not reporting a crime of which he was the victim, the Supreme Court suggested that a victim's report of a crime may be inherently reliable. *Id.* We observe that citizen reports of criminal activity have been deemed inherently reliable in the decisions of other Circuits [11] and in Texas *Terry*-stop cases.[12] As the Supreme Court also observed in *Adams*, a citizen reporting a crime to the police may be exposed to

---

**8.** "There can be no question that the stopping of a vehicle *and the detention of its occupants* constitute a 'seizure' within the meaning of the Fourth Amendment." *Colorado v. Bannister*, 101 S.Ct. 42, 43 n. 3 (1980) (per curiam) (emphasis added). *But see Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984) (distinguishing routine traffic stop from custodial detention); *United States v. Ross*, 465 U.S. 798, 102 S.Ct. 2157, 2163 n. 9, 2167 n. 18, 72 L.Ed.2d 572 (1982) (stating a brief vehicle stop may be a temporary detention rather than a seizure); *id.* at 2180 n. 9 (Marshall, J., dissenting) (same).

**9.** *See United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (holding that officers' reasonable suspicion of criminal activity asserted to justify a *Terry* stop must be grounded on a "particularized and objective basis" and "that the totality of the circumstances ... must be taken into account"); *United States v. Gomez*, 776 F.2d 542, 546 & n. 2 (5th Cir. 1985) ("A valid investigatory stop ... requires a reasonable conclusion by the police officer, in light of his experience, that some kind of criminal activity is taking place. Reasonable suspicion must be based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'") (footnote and citations omitted); *Miranda-Perez, supra*, at 289 ("'"[R]easonable suspicion" is to be determined by considering

the totality of the circumstances, including the "collective knowledge" of all officers in assessing the facts.'") (citations omitted).

**10.** Investigatory stops are also permissible if the officers act on a reasonable suspicion that the person stopped was involved in a completed crime. *See United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 680–84, 83 L.Ed.2d 604 (1985) (authorizing *Terry* stops for "investigation of past crimes," particularly for "felonies or crimes involving a threat to public safety"; officer's *Terry* vehicle stop on basis of flyer issued by different police department sustained); *Cortez, supra*, 101 S.Ct. at 695 n. 2 (stating a *Terry* stop is proper if the person stopped "is wanted for past criminal conduct").

**11.** "Some courts indicate that a citizen, who is not connected with the police or who is not a paid informant, is inherently trustworthy when he advises the police a crime is being committed." *United States v. Sierra-Hernandez*, 581 F.2d 760, 763 n. 1 (9th Cir.) (citing cases from other Circuits), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978). *Sierra-Hernandez* also suggests that a crime-victim's report carries even more indicia of reliability than that of an uninvolved observer citizen. *See* 581 F.2d at 763.

**12.** *E.g., Williams v. State*, 629 S.W.2d 146, 147 (Tex.App.—Dallas [5th Dist.] 1982).

criminal liability for making a false complaint. 92 S.Ct. at 1923 & n. 2. We note that Texas law provides for such sanctions,[13] and conclude that here the deputies were entitled to act upon information they received from the police dispatcher and from Naumann and his neighbors. We determine that the record clearly shows that the totality of the information available to the deputies justified a reasonable suspicion that Basey may well have been involved in the burglary of Naumann's home and that their subsequent investigatory stop of his car was accordingly proper.

The evidence indicates that area residents had seen Basey's car aimlessly wandering back and forth on the little-traveled, rural roads earlier that day;[14] that Naumann saw Basey's car close to his home shortly before Naumann discovered the burglary; that Naumann's curiosity was stirred to the degree that he asked Basey to explain his presence; that Basey's actions aroused the suspicions of either Naumann or his neighbors to the point that the vehicle's license plate number had apparently been recorded even before the burglary was discovered; and that the burglary report included a description and tag number for Basey's car.

■ The "reasonable suspicion" standard does not require that officers have probable cause to believe the person they stop is guilty, or that the circumstances be such that there is no reasonable hypothesis of innocent behavior.[15] We conclude that the facts here afforded the deputies a "particularized and objective basis for suspecting the particular person stopped of criminal activity," *United States v. Gordon,* 722 F.2d 112, 113–14 (5th Cir.1983), and that they acted on "articulable facts," *Miranda-Perez, supra,* at 287, and that this constitutes reasonable suspicion.

■ The *Terry* rationale does not, of course, support stopping a vehicle merely because it is a stranger to the officers and the neighborhood. *See United States v. Beck,* 602 F.2d 726, 729 (5th Cir.1979). Nor does the fact that an unsolved crime occurred justify stopping every vehicle for miles around for several hours after the crime is discovered. In the circumstances of this case, however, we hold that the deputies' stop of Basey's car was a proper investigatory stop of an identified vehicle that had been seen near and was later stopped close to the scene of a recent crime.[16]

13. Falsely reporting a crime to a peace officer is a Class B misdemeanor under Texas law, Tex. Penal Code Ann. § 37.08(a)(1) (Vernon 1974), subjecting the false reporter to punishment of up to 180 days in jail and/or a fine of up to $1,000, *id.* § 12.22. False reports can also expose the false reporter to civil liability. *See Santillana v. Williams,* 599 F.2d 634 (5th Cir. 1979) (per curiam). Where the reporter is obviously aware that his identity is disclosed, these sanctions are more realistic than in the case of the anonymous informant.

14. We note that vehicle stops have been upheld when officers saw an automobile being driven in a manner and at a time suggesting that an area was being "cased." *E.g., United States v. Rickus,* 737 F.2d 360, 362, 364–66 (3d Cir.1984) (reasonable suspicion found when officers saw a car moving slowly back and forth at 3:30 a.m. through business district and into a nearby residential area where numerous unsolved nighttime burglaries had occurred).

15. As the Ninth Circuit has written,

"Clearly, the officers were not required to rule out all possibility of innocent behavior before initiating a brief stop and request for identification. The test is founded suspicion, not probable cause. Even if it was equally probable that the vehicle or its occupants were innocent of any wrongdoing, police officers must be permitted to act *before* their reasonable belief is verified...." *United States v. Holland,* 510 F.2d 453, 455 (9th Cir.) (emphasis in original), *cert. denied,* 422 U.S. 1010, 95 S.Ct. 2634, 45 L.Ed.2d 674 (1975).

16. *See* 3 W. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.3(d), at 82–94 (1978). LaFave identifies six factors courts often consider in evaluating the validity of a *Terry* stop near the scene of a crime, *id.* at 84; of these six, five support the stop of Basey's car: (1) the particularity of the description of Basey's vehicle, which included the plate number; (2) the size of the area into which, given the time elapsed, the perpetrator of the crime might have fled (Basey was stopped soon after he was seen near Naumann's home and in close proximity to the scene of the crime); (3) the small number of persons moving about in the isolated rural area; (4) the place of the stop was related to the known direction of Basey's travel; and (5) the observed activity of the particular person stopped, in this case Basey's *repeated journeys* up and down the rural road, his presence near

### (b) The Legality of Basey's Arrest

A stop founded on reasonable suspicion of criminal activity permits detaining a motorist briefly to request identification, an explanation of the suspicious conduct which led to the stop (here, Basey's repeated appearances near the scene of the recent burglary), and permission to search. *Cf. United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985) (upholding stop in which officer asked driver to produce driver's license and vehicle registration, and requested permission to search); *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 3150–51, 82 L.Ed.2d 317 (1984) (in *Terry* stops, an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"); 3 W. LaFave, *supra*, § 9.2, at 36 (citing cases).

The deputies asked Basey to produce his driver's license, which he did, and to explain his presence in the area, which he attempted to do. After Basey stated that he had borrowed the car he was driving from a friend, the deputies asked Basey to show evidence of liability insurance coverage. Although Basey showed proof of coverage for three other vehicles, it is uncontroverted that he had no such proof for the car he was then driving.[17] The district court found that Basey was taken into custodial arrest at this time and that the vehicle was then searched.

Basey's claim is that the arrest for failure to show liability insurance was "a mere excuse for the officers to search for and seize articles in the car." Basey asserts the deputies arrested him primarily to retain control over him while they investigated the burglary, and that his arrest for inability to show liability coverage therefore was merely pretextual.[18]

Basey's focus on the officers' motive for the arrest misperceives the proper issue. "[A]lmost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an *objective assessment* of an officer's actions in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) (emphasis added). As the *Scott* opinion explained,

Naumann's house, and his strained attempt to explain his presence to Naumann. The sixth factor listed by LaFave is the officers' knowledge that the person stopped has been involved in criminality of the type under investigation, which did not exist in this case.

17. The Texas statute requires (with certain here inapplicable exceptions) any vehicle owner and/or operator (one who is in actual physical control of a motor vehicle) to maintain liability insurance coverage on the vehicle *and* to furnish evidence of such coverage at the request of a police officer. Failure to do so is a misdemeanor. Tex.Civ.Stat.Ann. art. 6701h, §§ 1, 1A, 1B, 1C, 32(e) (Vernon Supp.1987). "It is a defense to prosecution under" article 6701h "if the person charged produces in court" an insurance policy or certificate reflecting that the required coverage was in force at the time of the offense charged. *Id.* § 1D.

Texas law authorizes warrantless misdemeanor arrests if an officer has "probable cause to believe that the suspect has committed a crime *in his presence.*" *Bodzin v. City of Dallas*, 768 F.2d 722, 724 (5th Cir.1985) (emphasis in original; citing Tex.Code Crim.Proc.Ann. art. 14.-01(b) (Vernon 1977)); *see also Tores v. State*, 518 S.W.2d 378 (Tex.Crim.App.1975) (stating that under Texas law officer may take driver into custody for any traffic offense except speeding).

At the suppression hearing, the government's theory, not then or subsequently ever contested by Basey, was that Basey's failure to produce evidence of the required insurance coverage constituted probable cause to believe that he was violating article 6701h. Thus the existence of probable cause for arrest is not in issue.

18. Basey produced evidence that Burnet County arrest records reveal only one other arrest founded solely on a driver's failure to show proof of financial responsibility. As noted above, Texas law leaves the decision of whether to arrest for most traffic offenses to the police officer's discretion, and Basey has not argued that the deputies' decision to arrest him was based on some impermissible criterion such as race, religion, or other arbitrary classification, or his exercise of constitutional rights. *Cf. Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (discussing constitutional limitations on prosecutorial discretion). We also observe that the offense for which Basey was arrested is undiscoverable until and unless a driver is stopped; consequently such arrests almost inevitably occur in the context of stops based on and arrests for other offenses, primarily other traffic offenses.

"[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." 98 S.Ct. at 1723. Thus, our inquiry must address whether an " *'objective assessment* of the officer's actions in light of the facts and circumstances confronting him at the time' " supports the legality of his actions, *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985) (emphasis added; citation omitted), and not "the officer's actual state of mind at the time the challenged action was taken," *id.*

■ The district court concluded Texas' financial responsibility statute permits police to arrest a driver if that driver cannot show proof of insurance coverage for the car he is driving. Basey has not challenged this conclusion, nor questioned the constitutionality of the Texas statute. The sole question Basey raises is whether the existence of an ulterior motive—namely to further investigate the burglary—will taint or invalidate an otherwise lawful arrest. As *Scott* plainly states, the unchallenged premises that the deputies had probable cause to and could lawfully arrest Basey for violation of the Texas financial responsibility statute, and that the arrest was in fact made on that basis, render irrelevant any inquiry into the deputies' above-referenced alleged ulterior motivation.[19]

### (c) The Search of Basey's Car

■ Under *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981), "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporane- ous incident of that arrest, search the passenger compartment of that automobile" (footnote omitted). *Belton* makes it plain that such a search will be upheld even if it occurs after an occupant placed under arrest is out of the vehicle and even if it discloses evidence relevant to a previously undiscovered crime rather than a weapon or evidence of a crime known before the search occurred. *See* 101 S.Ct. at 2862.

■ Because the trial court concluded that the search of Basey's car was incident to his lawful arrest, and because we agree with that conclusion and uphold the search on that ground, we do not reach the questions of whether, absent the arrest, the deputies would have had probable cause to search Basey's car under the automobile exception to the warrant requirement, or whether they could have done so in a "vehicle frisk" as part of a *Terry* stop.[20]

Basey also contends that, even if the deputies discovered the radios during a proper search of the passenger area, Deputy Meeks' use of one radio after Basey's arrest was improper and, further, that the radios were seized without probable cause and not in the course of an inventory of the contents of the vehicle. Basey further argues that evidence at trial about the broadcast and the radios themselves should have been suppressed.

■ Even assuming that Meeks' brief use of the radio, without turning it on or changing the channel, amounted to a seizure, which we doubt, *Belton* is nonetheless dispositive of this issue. As *Belton* held, a vehicle search incident to a lawful arrest can extend even to containers located in the car's passenger compartment, not because "the arrestee has no privacy interest in the container," but because "the

---

19. The district court also found that the deputies "acted in good faith in arresting Mr. Basey for failure to provide proof of liability insurance." Because of our above conclusion, we do not find it necessary to determine whether this finding is clearly erroneous insofar as it determines that the deputies would not have arrested Basey had they not desired to further investigate the burglary; however, it is clear, and not really challenged, that at least in all other respects this finding is not clearly erroneous.

20. We observe, however, that when reasonable suspicion exists to support a *Terry* stop, officers can properly search a passenger compartment for self-protection, and that seven firearms had been reported to be missing from Naumann's house. *See Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 3479–82, 77 L.Ed.2d 1201 (1983).

lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." If the initial arrest is lawful, "a search incident to arrest requires no additional justification." 101 S.Ct. at 2864. *Belton* also implicitly approves the minimal "seizure" that occurs when officers briefly handle a container during the search. We view the momentary handling of the radio in Basey's car as well within that implicit approval and conclude that Meeks' use of the radio was proper as part of the *Belton* search of the vehicle's passenger compartment. Furthermore, we do not view *Belton* as having been in any way narrowed by *Arizona v. Hicks*, —— U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

Apart from the fact that *Belton* clearly approves an additional intrusion on privacy during a vehicle search incident to an arrest, *Hicks* mandates suppression only when the police conduct challenged "produce[d] a new invasion of [a defendant's] privacy." In *Hicks*, officers entered the defendant's apartment under the exigent circumstances exception to the warrant requirement to investigate a shooting. An officer noticed expensive audio equipment,

seemingly out of place in the defendant's "squalid and otherwise ill-appointed" apartment, and moved some of the stereo components in order to find and check the serial numbers. The Court held this "did not amount to a seizure" but that physically handling the equipment in such a way as to discover otherwise concealed information thereon was a separate search which, unless the items examined were within the scope of the officers' justification for entering the dwelling, required probable cause or other independent legal basis because of the additional privacy interest invasion involved.

In this case, in contrast, even if we were to regard Meeks' broadcast (or reception) over the channel to which the already turned on radio was set as a separate search, it was not itself an additional intrusion on any reasonable privacy interest Basey might assert. No "private" channel of Basey's was involved, and Basey had no privacy interest in any broadcast Deputy Meeks or any other similarly situated person might send out into the public airwaves over the same channel, or in any broadcasted response thereto.[21] Consequently,

---

**21.** The record does not indicate whether Deputy Meeks' broadcast was made over a citizens band (CB) or aircraft frequency. In either situation, no "interception" of a broadcast occurred because Meeks was the originator at one side of the conversation and the recipient of the transmission which came in response. The statutes barring unauthorized divulging of radio transmissions are applicable only if the person divulging information intercepted a transmission between two or more other people, and do not apply to participants in the transmission. *See* 47 U.S.C. § 605(a); 18 U.S.C. §§ 2510(4), 2511; *see also United States v. McGuire*, 381 F.2d 306 (2d Cir.1967), *cert. denied*, 389 U.S. 1053, 88 S.Ct. 800, 801, 19 L.Ed.2d 848 (1968). Section 605 is entirely inapplicable to transmissions "by a citizens band radio operator" (or "an amateur radio station operator") and is also subject to "chapter 119, Title 18." 47 U.S.C. § 605(a). "Chapter 119," 18 U.S.C. §§ 2510–2520, bars use of *intercepted* communications as evidence, *id.* § 2515, but does not prohibit the interception of radio voice communications unless "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation," *id.* § 2510(2). Protections for radio communications set out in section 605 are generally considered to be restricted by the "reasonable

expectation of privacy" requirement of section 2510(2). *E.g., United States v. Rose*, 669 F.2d 23, 25–27 (1st Cir.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); *Edwards v. Bardwell*, 632 F.Supp. 584, 586–89 (M.D.La.), *aff'd*, 808 F.2d 54 (5th Cir.1986) (table; unpublished opinion). It has also been held that "Congress intended to exclude law enforcement officers from the purview of the new [1968] § 605." *United States v. Hall*, 488 F.2d 193, 195 (9th Cir.1973); *Edwards v. Bardwell, supra.* We further observe that use of frequency 122.900 for ground-to-ground communications appears to be an unauthorized use of the frequency, *see* 47 C.F.R. § 87.201(d), and that Federal Communications Commission regulations generally regard the use of the public airwaves to further criminal activities as an unauthorized use, *e.g.,* 47 C.F.R. § 95.413(a)(1) (governing CB radios). Unlicensed broadcasts have been held to be beyond the protective provisions of 47 U.S.C. § 605. *E.g., United States v. Sugden*, 226 F.2d 281, 285 (9th Cir.1955), *aff'd*, 351 U.S. 916, 76 S.Ct. 709, 100 L.Ed. 1449 (1956) (per curiam). In any event, the fact that Basey was not a party to the exchange between Meeks and the unknown voice precludes consideration of any challenge by him to the disclosure of that exchange. *Hall*, 488 F.2d at 199 ("[A] party may not protest if he was not a participant in a

*Hicks* does not require suppression of the evidence arising from Meeks' use of the radio found in Basey's car.[22]

We conclude that these facts do not invoke the concerns of *Hicks* and that *Belton* supports treating the deputy's broadcast over the radio as part of the vehicle search. Moreover, in any event Basey had no privacy interest in the public airwaves broadcast sent and received by Meeks on the radio. In addition, Deputy Meeks' brief use of the radio was clearly not the seizure which allowed the radios to be used as evidence at trial. That seizure occurred when the police decided to impound the car and all its contents.

 Finally, because Basey's arrest was lawful, the papers taken from him during the booking search were also properly admitted as evidence, and the leads which were developed from those papers—most notably resulting in the arrest of Ponce and Lopez—were not tainted by any police misconduct. The papers found on Ponce and Lopez were therefore found as the result of lawful police conduct and were properly found to be admissible.

Accordingly, we conclude that the district court was correct in admitting all evidence discovered through the stop of Basey's car, his arrest, and the vehicle search.

## 2. Admissibility of Evidence Associated with the Abandoned Van

 On appeal, Basey contends that the van was discovered solely because of his improper stop and arrest, and that the marihuana and radios found therein are therefore tainted and should have been suppressed. As noted above, however, Basey did not mention the van or its contents in his pretrial suppression motion, although he did object to the admission of this evidence at trial. Motions to suppress evidence "must be raised prior to trial," Fed. R.Crim.P. 12(b), 12(b)(3), and a failure to raise such a motion in a timely manner constitutes a waiver of objection, Rule 12(f). Basey did not ask the court to conduct a suppression hearing on this issue. Finding that no miscarriage of justice resulted from the admission of this evidence,[23] we will not consider the merits of

specific conversation."); *Shimon v. United States,* 352 F.2d 449, 451–52 (D.C.Cir.1965). *See also United States v. Pasha,* 332 F.2d 193, 197–98 (7th Cir.) (holding that revenue agents' impersonation of defendants for whom calls the agents answered were intended did not constitute interception of wire communications), *cert. denied,* 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964). And, apart from specific statutory protections, there is no reasonable expectation of privacy in broadcasts over the public airwaves which are exposed to everyone in the area having a radio tuned to the same nonexclusive channel. *United States v. Hoffa,* 436 F.2d 1243, 1247 (7th Cir.1970), *cert. denied,* 400 U.S. 1000, 91 S.Ct. 455, 457, 27 L.Ed.2d 451 (1971); *Edwards v. Bardwell, supra.*

22. This lack of a reasonable expectation of privacy also distinguishes *United States v. Turk,* 526 F.2d 654, 666 (5th Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), cited by Basey, in which we held it improper for officers to listen to a tape recording seized in an inventory search. Because no similar privacy interest is involved here, *Turk* is inapposite.

Although the record is not clear, it may be that Meeks' observation of the channels to which Basey's radios were tuned would not have been possible except for his handling of the radios during the vehicle search, which, without other justification, would be con-

demned by *Hicks* if not justified under *Belton*. However, although Basey objected to the admission of the radios and Meeks' testimony about the broadcast, Basey did not move to suppress evidence about the channels to which the radios were tuned when they were found, nor did he object to Meeks' testimony on this subject or complain of this evidence on appeal. In any event, the channels were not changed by the arresting deputies, and the officer conducting the inventory examination of Basey's car after his arrest also testified that the radios were tuned to these channels; this testimony, which was in no sense the fruit of Meeks' observations of the radios, renders essentially immaterial any possible error in the admission of Meeks' testimony as to the channels to which the radios were tuned.

23. Even were we inclined to reach these issues, we have already determined that there was no invasion of Basey's constitutional rights in his stop, arrest, or search; and, apart from any taint that might arise if the van and its contents were the fruit of any invasion of Basey's constitutional rights in the earlier stop, arrest, and search of Basey and his car, Basey plainly has no standing to seek suppression of the van and its contents. Further, the record indicates that the van was discovered during the ongoing, previously commenced burglary investigation, rather than as a result of the stop of Basey.

this issue not properly raised below. *See United States v. Harrelson,* 705 F.2d 733, 738 (5th Cir.1983).

### 3. Admissibility of Basey's Statements to Agent Pena

Basey was arrested on the night of September 5. He was first questioned by Burnet County Sheriff's Department Officer Simpson about fifteen hours later, on September 6, after Basey was arraigned before a state magistrate that morning on state drug charges. Officer Simpson testified at the suppression hearing that Basey initially insisted that he would not give any information at all unless he were promised help.[24] Later that day, Simpson again met with Basey, this time joined by DPS investigator Nesteroff. The district court concluded that, at some time during these sessions, Simpson indicated he would help Basey with the charges then facing him if

Basey offered information about the drug trafficking organization. Later that same evening, Basey was questioned again, this time by DEA Agent Pena,[25] who at the outset of the interview advised Basey of his *Miranda* rights and told Basey that he would make no specific promises of help but would inform the United States Attorney if Basey provided useful information.[26] Agent Pena testified at trial that Basey described in general terms the drug trafficking organization which had brought in the vanload of marihuana, stating that the organization had been active for four or five years, that the marihuana came from Guadalajara, and that a ground crew with seven or eight members was involved. The following morning, Simpson again questioned Basey, and Basey made further statements to Simpson. The district court ordered Basey's statements to Simpson suppressed on the ground that they were induced by improper promises.[27]

**24.** Basey was on federal special parole for a drug conviction in a California federal court and was concerned both with the state drug charges then facing him and with his status as a parole violator (his presence in Burnet County violated the condition of his parole requiring that he remain within a specified area). Basey has apparently not been prosecuted on the state drug charges that were filed against him in Burnet County.

**25.** Agent Pena was accompanied by DEA Agent Brad Watson, who did not testify at the suppression hearing or trial. During this session, Officer Simpson was also in and out of the room.

**26.** At the suppression hearing, Pena testified as follows:

"I said that ... I could not give him a deal, that his cooperation would be told to the Assistant U.S. Attorney."

" .... "

"... The only thing I told Mr. Basey was, that I would contact our Assistant U.S. Attorney and advise him of his [Basey's] cooperation."

" .... "

"All I told him was, I was in no position to make any sort of deal, that any deals that were to be made, would have to be made by the Assistant U.S. Attorney."

**27.** The district court's suppression order findings state:

"Defendant Basey ... seeks to suppress statements made by him to Officer Simpson after Officer Simpson told him that he could 'help him' in regard to charges of parole violation in Burnet County. The Court finds that

these statements are properly suppressed as plea negotiations. [Citations omitted.] Although the Fifth Circuit has recently limited the 1979 amendments to Rule 11(e)(6)(D) to negotiations between a defendant and a government attorney, *United States v. Keith,* 764 F.2d 263 (5th Cir.1983), this Court is of the opinion that the situation in this case goes beyond the holding in *Keith.* Mr. Basey believed, and was encouraged by Officer Simpson to believe, that Basey's cooperation would lead to help from Officer Simpson on any charges he may face or would face in the future. The Court finds it manifestly unfair to allow these statements to be used against Basey, especially when Officer Simpson knew that he did not have the authority to make such promises to Mr. Basey. Accordingly,

"IT IS, THEREFORE, ORDERED that statements made by Mr. Basey from the time Officer Simpson assured him that he would help him if Basey cooperated, until the time Drug Enforcement Agent Javier Pena gave Mr. Basey *Miranda* warnings, [are] to be suppressed." (Emphasis in original.)

During the suppression hearing, before the district court entered an oral ruling on Basey's motion along the same lines as these written findings, the government stated it intended to produce at trial only evidence of Basey's statements to Pena and not statements made to Simpson, and Basey's statements to Simpson were never offered at trial. Consequently, the admissibility of statements Basey gave to Officer Simpson on September 7, *after* Basey met with Agent Pena and *after* the end of the period the suppression order covered, was never in issue.

Basey moved to suppress all of his post-arrest statements and now argues on appeal that admitting statements he made to Pena was improper. We view Basey's argument as being founded on two alternate grounds: first, that these statements were obtained through an illegal arrest; or, second, that even if the arrest was lawful, improper police conduct after the arrest tainted the statements.[28] Having already concluded that Basey's stop and arrest were lawful, we consider only the theory that postarrest misconduct tainted Basey's statements. The district court decided that Officer Simpson's interrogation was improper. We accept that ruling, *arguendo*. Basey contends on appeal that "[t]he expectations created by Officer Simpson's conduct could well have carried over to Investigator Pena's interrogation, despite the intervening *Miranda* warnings."

The question we address is whether Basey's statements to Agent Pena were acquired " 'by exploitation of [some police] illegality or instead by means sufficiently distinguishable to be purged of the primary taint,' " *United States v. Parker*, 722 F.2d 179, 184 (5th Cir.1983) (quoting *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)), and whether, if some taint arose from Simpson's conduct, that taint had been attenuated before Basey gave information to Pena.

Whether this attenuation has occurred depends on the facts of the particular case. *United States v. Miller*, 608 F.2d 1089, 1102 (5th Cir.1979), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1119 (1980). "Factors to be considered, in addition to [*Miranda*] warnings, are the temporal proximity of the illegality and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Miller, supra*, at 1102, *quoted in Parker, supra*, at 186. *See also Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975). We examine each of these factors in turn.

*(a) Miranda Warnings*

█ The record fully supports the district court's conclusion that Basey was advised of his rights at arraignment and given *Miranda* warnings repeatedly before the questioning of Basey by DEA Agent Pena began, and that Pena administered the warnings afresh immediately before starting to question Basey. Although we have written that "[t]he fact that [a defendant] was given *Miranda* warnings, standing alone, will not prove that the statement was sufficiently an act of free will," *Parker, supra*, at 186, we also observe that the curative power of *Miranda* warnings may be given great weight in some situations. "The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.' " *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 1294, 84 L.Ed.2d 222 (1985) (citation omitted). Accordingly, we view the repeated efforts to inform Basey of his rights as a factor tending to support the conclusion that his statements to Pena were an act of free will.

*(b) Temporal Proximity of the Illegality and Confession*

The record is unclear about the precise amount of time that elapsed between Simpson's questioning of Basey and Pena's arrival. An examination of this factor requires that we consider "the precise conditions" of the two interrogations in order to determine whether the fact that the two events were separated by a relatively short interval is outweighed by other circumstances. *Cf. Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980) (discussing forty-five-minute in-

We express no opinion about whether the district court was correct in construing the reach of the *Keith* decision or in its decision to suppress statements Basey made to Officer Simpson.

**28.** Basey does not claim that—while he was detained in Burnet County and before he gave the statements at issue—he either asked to see an attorney or stated that he did not wish to talk to law enforcement officials. Nor does Basey present any Sixth Amendment assistance of counsel argument on appeal.

terval between improper arrest and confession, and holding confession admissible). Because of the events intervening between the two interrogations, discussed below, we determine that the mere temporal proximity of the two sessions does not require us to conclude that any taint from Simpson's interview of Basey must inevitably have carried over into his meeting with Pena.

### (c) Intervening Circumstances

We deem it significant that Basey plainly recognized that Burnet County Sheriff's Department Officer Simpson and DEA Agent Pena represented different governmental entities.[29] Furthermore, any representations made by Simpson about his ability to help Basey on *state* charges cannot be conclusively presumed to have carried over into an interview with a federal agent. In this context, we observe that Basey was thirty-nine years old at the time of his arrest, that the first of his drug convictions (on failure to pay marihuana transfer tax) occurred in 1969, and that, familiar with law enforcement for most of his adult life,[30] Basey surely "was by no means a stranger to the criminal law." *Greenwald v. Wisconsin*, 390 U.S. 519, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968) (Stewart, J., dissenting).

Basey testified that Pena "said he couldn't do it [make any deal] himself, [but that] he would have to take it higher." The transcript of the suppression hearing also shows that Basey acknowledged that his statements were voluntary,[31] but testified that Pena had promised him that what he said would be used only for investigatory purposes and not against Basey, and Basey's objection at the suppression hearing to the admission of his statements to Pena was founded on the claim that Pena's promises had induced him to speak.[32] We consider Basey's testimony at the suppression hearing as further support for the conclusion that intervening events had eliminated any taint the district court found was caused by Simpson's conduct, because Basey's testimony at the suppression hearing was that his disclosures to Pena arose from a motivation factually distinct from that which stimulated his revelations to Simpson.

### (d) Purpose and Flagrancy of Official Misconduct

As for the final factor, we must determine whether the police action in this case "rise[s] to the level of conscious or flagrant misconduct requiring prophylactic exclusion of petitioner's statement." *Rawlings, supra*, 100 S.Ct. at 2564. The district court found only that Simpson indicated to Basey that some assistance would be forthcoming on charges facing him; this is the only "misconduct" at issue. The record does not disclose, and Basey does not claim, that police employed "actual or threatened physical violence," *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960), or that he was abused, denied necessities, or questioned with unfair or

---

**29.** Basey plainly indicated that he recognized he was dealing with officers from different agencies in the suppression hearing: he never claimed that he believed anything except that Agents Pena and Watson were from the DEA; Basey testified, "I knew I was on special parole, at this time, and I knew that I was out of my district without permission," and sought help from the agents on his federal parole violation charges; and he understood that the agents would discuss his cooperativeness with the United States Attorney rather than any state official.

**30.** Basey was asked on cross-examination at the suppression hearing,

"Q And you understand that after you have been arrested you have a right to remain silent and you have the right to talk to a lawyer, is that right?

"A [BASEY] That's correct.

"Q And you knew that before you got involved in this deal on September the 5th, is that right?

"A [BASEY] That is correct."

**31.** On cross-examination, Basey was asked,

"Q So, you knew at the time you were talking with [Agent Pena] on September the 6th of 1985, that the conversations you were making to him was being done voluntarily by you, is that correct?

"A [BASEY] Yes."

**32.** Pena denied any such promises. The district court impliedly credited Pena over Basey. Basey does not contend on appeal that the district court erred in not suppressing his statements to Pena on the basis of Pena's alleged promises to Basey.

undue frequency, length, or persistence, or that any other method was used which, in light of Basey's intelligence, age, and mental and physical condition, was likely either to induce a false confession or to unfairly undermine his ability to make a choice whether to give a statement or otherwise cooperate.

We find that what the district court identified as Simpson's misconduct was not likely either to overpower Basey's will or to induce a false confession. This conclusion is reinforced by the character of Basey's statements. Basey attempted to avoid incriminating himself by describing the marihuana trafficking activities in general terms, without details about the particular vanload found or his role in the scheme. Basey's efforts to disclaim participation and culpability indicate that his will was in no way overborne by any police conduct.

Accordingly, we conclude, under the totality of all the circumstances surrounding Basey's meeting with Agent Pena, that Basey's statements to Pena were voluntarily given as an act of free will, and that the district court was correct in holding that these statements were admissible.

### 4. Basey's Substantive Offense Conviction for Possession

Basey moved for a judgment of acquittal notwithstanding the verdict on Count Two of the superseding indictment which charged him with the substantive offense of possessing the marihuana found in the van with the intent to distribute it. Basey contends that all evidence, viewed in the light most favorable to the jury verdict, was inadequate to prove actual or constructive possession.

Because no aiding and abetting instruction was given to the jury, Basey's substan-

tive offense conviction cannot rest on that basis. *See United States v. Wilson*, 657 F.2d 755, 762–63 (5th Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982).[33] Instead, we view Basey's conviction on the substantive possession offense as founded on the rule that each conspirator may be held criminally culpable for substantive offenses committed by the conspiracy of which he is a member while he is a member:

"Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a co-conspirator, even though that party does not participate in the substantive offense or have any knowledge of it. *Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180 [1184] 90 L.Ed. 1489 (1946). Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, the defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners. *United States v. Sullivan*, 578 F.2d 121, 122–23 (5th Cir.1978). This principle has been repeatedly applied by this circuit in cases involving drug conspiracies and substantive drug violations. [Citing cases.]" *United States v. Michel*, 588 F.2d 986, 999 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979).

Otherwise stated: "Once we have concluded that there was sufficient evidence to prove that [a defendant] was a knowing member of the conspiracy, no additional evidence is necessary to warrant a conviction on a substantive count which charges him with an event which occurred while he was active as a member of the conspiracy." *United States v. Johnson*, 575 F.2d 1347,

---

**33.** We observe that convictions of "scouts" or "lookouts" are most commonly, though perhaps not invariably, based upon their participation in a conspiracy, *e.g., United States v. Kelly*, 749 F.2d 1541, 1547 (11th Cir.1985) (affirming conspiracy convictions of two lookouts), or on an aiding and abetting theory, and that a substantive offense conviction may be upheld if sufficiently supported by evidence and if proper aiding and abetting jury instructions are given,

*e.g., United States v. Soto*, 591 F.2d 1091, 1103–04 & n. 8 (5th Cir.1979) (affirming substantive possession conviction of a drug transaction lookout and noting that aiding and abetting statute, 18 U.S.C. § 2, provides a basis for conviction distinct from the *Pinkerton* principle (discussed below)), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298, 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58 (1979).

1366–67 (5th Cir.) (citing *United States v. Becker*, 569 F.2d 951, 958–59 (5th Cir.) (discussing *Pinkerton*), *cert. denied*, 439 U.S. 865, 1048, 99 S.Ct. 188, 726, 58 L.Ed.2d 174, 708 (1978)), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 1214, 59 L.Ed.2d 454 (1978).

Conviction for substantive offenses under *Pinkerton* requires appropriate instruction to the jury on that theory. *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949); *Wilson, supra*, at 763. In upholding the substantive offense conviction of a conspirator, we have approved an instruction that "fairly presented the *Pinkerton* principle to the jury" when the charge instructed the jury that if "they were satisfied beyond a reasonable doubt that a conspiracy existed and that a defendant was one of the members of it, then that defendant assumed the responsibility for the acts and statements of all other members made in furtherance of the conspiracy." *Michel, supra*, at 999 n. 13.

The instruction given in the instant case resembles the instruction discussed in *Mi-chel* and was drawn almost verbatim from a model commonly used in this Circuit for conspiracy counts. *See* U.S. Fifth Circuit District Judge's Association, *Pattern Jury Instructions—Criminal Cases* 60–62 (West Pamphlet 1978) (regular charge for conspiracy). In *United States v. Acosta*, 763 F.2d 671, 681 (5th Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985), we discussed a jury instruction closely paralleling the conspiracy instruction given in this case and concluded the instruction "did fairly express the *Pinkerton* principle." *Compare Acosta*, 763 F.2d at 681 n. 7 (quoting instruction found to meet *Pinkerton* requirements) *with Pattern Jury Instructions—Criminal, supra*, at 62 (second and third full paragraphs; the instruction here was more extensive and included, *inter alia*, the last full paragraph at 62 and the last two paragraphs at 61).[34]

■ We observe that other *Pinkerton* instructions recommended by commentators and upheld by courts,[35] or adopted as a

**34.** The *Acosta* opinion was issued on June 6, 1985, fully nine months before the highly similar jury instruction was given in this case on March 19, 1986. We must conclude that the *Acosta* and *Michel* decisions put Basey on notice that the issue of his guilt of the substantive possession offense under *Pinkerton* was properly submitted to the jury by this instruction. Basey has never complained that the instruction inadequately stated the rule of *Pinkerton*, and Basey neither offered an alternate *Pinkerton* instruction nor assigned error to the instruction on appeal. Basey's failure to raise this point would bar consideration of these theories even if we were to find the *Pinkerton* instruction given in the instant case inadequate, which we do not. *E.g., United States v. Johnson*, 718 F.2d 1317, 1325 n. 23 (5th Cir.1983) (en banc) (the "rule against raising issues for first time on appeal prevents 'scanning the record for new theories' ") (citation omitted).

**35.** Judge Posner, writing for the Seventh Circuit, suggests that, at minimum, a proper *Pinkerton* instruction should "at least state clearly that the defendant can be convicted of a substantive crime committed by his coconspirator in furtherance of the conspiracy." *United States v. Manzella*, 791 F.2d 1263, 1268 (7th Cir.1986). The *Pinkerton* principle can be addressed in an instruction separate from the general conspiracy instruction, for example:

"If you find that a particular defendant is guilty of conspiracy as charged in Count I, you may also find that defendant guilty of a substantive offense as charged in any other count of the indictment, provided that you find that the essential elements of that count as defined in these instructions have been established beyond reasonable doubt, and provided that you also find beyond reasonable doubt,

"First, that the offense defined in the substantive count was committed pursuant to the conspiracy, and

"Second, that the particular defendant was a member of the conspiracy at the time the substantive offense was committed.

"Under the conditions just defined a defendant may be found guilty of a substantive count even though he did not participate in the acts constituting the offense as defined in the substantive count. The reason for this is that a coconspirator committing a substantive offense pursuant to a conspiracy is held to be the agent of the other conspirators." 2 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions: Civil and Criminal* § 27.17, at 43–44 (3d ed. 1977) (instruction on conspirator's "Guilt of Substantive Offense").

A *Pinkerton* instruction almost identical to that set out above has been approved in *United States v. Zabic*, 745 F.2d 464, 474–75 (7th Cir. 1984).

pattern charge in other Circuits,[36] may more plainly inform the jury that a conspirator can be found guilty of the substantive offenses committed pursuant to the conspiracy. Nevertheless, we determine that the instruction given in the instant case expressed the *Pinkerton* principle at least as clearly as the instruction approved in *Acosta,* by which we are bound.[37] We conclude that the jury could have found Basey guilty of the substantive possession offense under *Pinkerton* and that his conviction on this count consequently should be affirmed.[38]

### 5. Basey's Contentions on Appeal—Conclusion

Having examined each issue Basey raises on appeal and having determined that each contention lacks merit, we accordingly affirm his convictions.

### B. Ponce's Contentions on Appeal

Appellant Ponce raises four issues on appeal: (1) that the entire jury venire should have been quashed on the basis of prior jury service; (2) that the evidence was insufficient to support his conviction on possession of the marihuana found in the motel room nightstand; (3) that the evidence was insufficient to support his conspiracy conviction; and (4) that the district court erred in denying his motion for severance. We address these contentions in turn.

### 1. Ponce's Motion to Quash the Venire for Prior Jury Service

Ponce complains that five jurors of those empaneled (and three not seated) had served on other juries in the forty-five days before trial, and that two jurors selected had served together on one criminal case. Ponce sought to strike the entire panel and also tried to challenge for cause those jurors with prior service, both of which the district court denied. Basey and Lopez joined Ponce in this motion, but only Ponce raises the issue on appeal.

We have held that the importance of a defendant's right to question prospective jurors about prior jury service justifies challenging jurors if they have served in

**36.** *E.g.,* Committee on Federal Criminal Jury Instructions of the Seventh Circuit, *Federal Criminal Jury Instructions of the Seventh Circuit: Volume III,* at 6 (West Pamphlet 1986) (instruction on conspirator's liability for substantive crimes committed by coconspirators):

> "A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of or as a natural consequence of the conspiracy.
>
> "Therefore, if you find a defendant guilty of the conspiracy charged in Count(s) _____ and if you find beyond a reasonable doubt that while he was a member of the conspiracy, his fellow conspirator(s) committed the offense(s) charged in Count(s) _____ in furtherance of or as a natural consequence of that conspiracy, then you should find him guilty of Count(s) _____."

The Seventh Circuit's pattern charge closely parallels this Court's discussion of the *Pinkerton* principle in *United States v. Tilton,* 610 F.2d 302, 309 (5th Cir.1980). We observe, however, that special cases may require more fully developed instructions, for example, a conspiracy involving an offense in which special *mens rea* requirements exist or a substantive crime that was not a primary goal of the conspiracy. *E.g., United States v. Harrelson,* 754 F.2d 1153, 1171–74 (5th Cir.), *cert. denied,* — U.S. —, —,

106 S.Ct. 277, 599, 88 L.Ed.2d 241, 578 (1985); *United States v. Alvarez,* 755 F.2d 830 (11th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985); *see also* Annot., *Federal Criminal Liability of Narcotics Conspirator for Different Substantive Crime of Other Conspirator,* 77 A.L.R.Fed. 661 (1986).

**37.** The writer notes, for himself, that if not bound by *Acosta* he would hold the conspiracy instruction here (and in *Acosta* ) insufficient to submit the *Pinkerton* theory respecting the substantive offense, primarily because the instructions do not require that the jury find that the coconspirators actually committed the substantive offense or did so pursuant to the conspiracy while defendant was a member of it.

**38.** Basey's insufficiency complaint on the possession count can be viewed as impliedly raising the issue of whether evidence was sufficient to support a conviction based on the *Pinkerton* principle. We think it plain that the jury was presented with more than sufficient evidence to justify the conclusion that Basey was a knowing participant in the conspiracy, that the offense of possessing with intent to distribute the marihuana found in the van was an object of the conspiracy, and that this offense was accomplished by at least some of the conspirators pursuant to and during and in furtherance of the conspiracy while Basey was a member of it.

another similar case in the period between voir dire and the beginning of trial. In this case, however, jury selection began on the afternoon of March 17, 1986, and the case proceeded speedily through trial, with the jury retiring to deliberate on the morning of March 19. Ponce does not claim that any interim service occurred, but he contends that some of the factors examined in those cases support creating a right to challenge for cause jurors who, in the past, have served together, or to quash a panel with an unusual amount of recent prior jury service. He asks that *United States v. Mutchler*, 559 F.2d 955, 959 (5th Cir. 1977), *discussed in United States v. Jefferson*, 569 F.2d 260, 262 (5th Cir.1978), be extended to these facts. We note that the *Mutchler* opinion was carefully narrowed in a subsequent opinion, 566 F.2d 1044 (5th Cir.1978) (per curiam) (modifying the *Mutchler* opinion reported at 559 F.2d 955).

*Mutchler* (as modified) held that challenges for cause were proper if the challenged jurors had served in similar prosecutions after they were impaneled but before the accused's trial commenced ("interim service"). In *Mutchler*, a drug offense case, "ten prospective jurors had prior experience in narcotics cases," and, "[b]etween selection and trial date nine of those jurors sat on cases similar to that against appellants"; one juror had served on two drug cases; and some jurors had heard earlier cases involving the same prosecutor and government witness who were involved in the appellants' case. *Mutchler, supra,* 559 F.2d at 957. Unlike prior jury experience, interim service "rendered the prior voir dire [by appellant about previous jury service] and peremptory challenges all but meaningless with respect to the issue of

similar jury experience." *Id.* at 958. Consequently, "once a jury is struck, the designates cannot serve prior to trial in other cases similar in fact and in legal issue or in cases in which the same government witnesses testify." *Id.* at 960. *Mutchler* stated this rule did not apply to prior jury experience. *Id.* n. 2 (renumbered as note 3 by 566 F.2d 1044).

Ponce argues that the prior service involved in his case is closely analogous to the interim service at issue in *Mutchler* and is unlike prior service occurring at a time more distant from the trial. Although *Jefferson* did state that "[i]nterim service is more proximate in time and so creates a heightened danger of prejudice, which is especially great when the offenses are similar or the witnesses the same," *Jefferson, supra,* at 262, it is clear that the effectiveness of a defendant's voir dire of the jury on the issue of prejudice was the pivotal factor in *Mutchler*.

▪ The transcript of the voir dire proceedings in the instant case discloses that an unusually high number of the prospective jurors had prior jury experience, but that only two of the jurors finally seated had previously served together on one jury, and that those two jurors had served in a parole violation case, not in a controlled substances case.[39] Furthermore, none of the jurors seated in the instant case had served in cases involving appearances by the same witnesses or prosecutor who were involved in the instant case. These facts are significantly different from the facts of *Mutchler* noted above.

For these reasons, and because this case does not raise the central concern at issue

---

**39.** The record indicates that several members of the venire had already served in one of two federal criminal cases (tax and parole violation) or in one of two federal civil cases (a real estate dispute and a civil rights case) before jurors were seated for the instant case. Twenty of the thirty-four prospective jurors had served in the past on state or federal juries, and seventeen had "recent service," that is, service in the same federal district court within forty-five days before trial.

Several prospective jurors had served together on prior jury panels. Five jurors with recent

prior service (three in a criminal case, two in a civil) were seated. Only two of these five had served together on one of these federal juries (in the parole violation case). Two other jurors had served on Texas county grand juries. Two members of the venire had served in the immediate past on juries in cases which had involved the Assistant United States Attorney who prosecuted the instant case, but neither was selected to serve on the panel for the instant case (one of these two was excused for cause). The three defendants shared ten peremptory strikes and used all their strikes.

in the *Mutchler* decision—that interim service in analogous cases undercuts the value of voir dire—we decline to extend the right to challenges for cause to this highly dissimilar situation. Moreover, we know of no sufficient reason to conclude that prior jury service on the part of many prospective jurors creates any presumption of prejudice that would compel quashing the entire panel. Therefore, we view this case as one controlled by the long-standing rule that, in order to challenge an individual juror or an entire panel on the basis of prior service, it must be shown by specific evidence that the prior service biased a particular juror or jurors. *See United States v. Riebschlaeger,* 528 F.2d 1031, 1032–33 (5th Cir.), *cert. denied,* 429 U.S. 828, 97 S.Ct. 86, 50 L.Ed.2d 91 (1976). Ponce points to no evidence of such specific prejudice, and the record discloses that the district court questioned prospective jurors about their prior service and sought to discover any prejudicial impact that might be caused by that service, and that the jurors indicated that their prior service would not prejudice them. Furthermore, at the close of voir dire, the district court offered defendants' attorneys the opportunity to suggest additional questions to be put to the venire, but none of the attorneys requested that further questions be asked about prior service or possible prejudice resulting therefrom. Accordingly, we determine that Ponce's first complaint lacks merit.

### 2. Sufficiency of Evidence on the Possession Count

In reviewing a claim of insufficient evidence, we view the evidence and inferences that can be drawn therefrom, and accept all credibility determinations, in the light most favorable to the jury verdict, and then determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Saenz,* 747 F.2d 930, 935, 936 (5th Cir.1984), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985); *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd on other grounds,*

462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

Ponce claims that evidence was insufficient to support his conviction for possession of the marihuana found in the motel room nightstand. Testimony at trial indicated that DPS Officer Nesteroff smelled burned marihuana at 10:30 p.m., when he first came by the room, and that the smell was still pervasive and strong when the search warrant was executed more than two-and-one-half hours later. When officers entered the room, Ponce was asleep in one of the room's beds immediately next to the nightstand which contained the marihuana in an unlocked drawer. Ponce, together with Lopez, exercised joint control of the room, the furniture therein, and its contents. There was no evidence tending to indicate that Ponce did not have control over the marihuana or innocently explaining his presence by it.

Although it is possible to speculate that Ponce for some reason was unaware that marihuana was in the room, "a jury is free to choose among reasonable constructions of evidence," and evidence of guilt need not "exclude every reasonable possibility of innocence or be wholly inconsistent with every conclusion except that of guilt." *Bell, supra,* at 549. The facts of this case differ from those of cases in which we have found that a defendant's awareness of the presence of controlled substances could not properly be inferred from the circumstances, *e.g., United States v. Moreno-Hinojosa,* 804 F.2d 845, 847 (5th Cir.1986), and, instead, support a reasonable inference that Ponce was aware of the presence of the substance, *cf. Paez v. O'Lone,* 772 F.2d 1158 (3d Cir.1985).

Illegal possession of a controlled substance may be actual or constructive, and a person has constructive possession of a thing if he has dominion and control over its use. *E.g., United States v. Surface,* 624 F.2d 23, 24–25 (5th Cir.1980) (although defendant's companion carried the drug, defendant constructively possessed it by exercising dominion and control). "Constructive possession can be joint, as when more than one person occupy a room con-

taining the item." *United States v. Garcia*, 655 F.2d 59, 62 (5th Cir.1981); *id.* at 63 & n. 5 (defendant in motel room with suitcase containing cocaine constructively possessed the drug "because he had control over it"). *See also United States v. Marx*, 635 F.2d 436, 440 (5th Cir.1981) (driver constructively possessed drugs in passenger's suitcase); *United States v. Ocanas*, 628 F.2d 353, 361 (5th Cir.1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981).

Accordingly, although the issue is relatively close, we nevertheless conclude that a reasonable trier of fact could determine that the evidence proved beyond a reasonable doubt that Ponce knowingly possessed the 0.9–ounce of marihuana found in the motel nightstand.

### 3. Sufficiency of Evidence on the Conspiracy Count

■ The standard of review on insufficiency claims has been described above. Viewing all evidence and inferences therefrom in support of the jury verdict, we are compelled to conclude that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that Ponce knew of and intentionally joined the conspiracy respecting the marihuana found in the van.

"Before a defendant may be convicted of conspiracy under [21 U.S.C.] section 846, the government must prove both the existence of an agreement to commit a crime and that each conspirator knew of, intended to join, and participated in the conspiracy.... [K]nowledge, intent and participation, the essential elements of the crime, must be proved beyond a reasonable doubt." *United States v. Vergara*, 687 F.2d 57, 60–61 (5th Cir.1982). *See also United States v. Stanley*, 765 F.2d 1224, 1236–37 (5th Cir.1985).

"Although mere presence at the scene of the crime or close association with a coconspirator will not support an inference of participation," participation in a conspiracy can be inferred from " ' "a development and collocation of circumstances." ' " *Vargara, supra*, at 61 (citations omitted).

However, "we will not lightly infer a defendant's *knowledge and acquiescence* in a conspiracy." *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir.) (citation omitted; emphasis added), *cert. denied*, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983). "The government must show beyond a reasonable doubt that the defendant had the deliberate, knowing, and specific intent to join the conspiracy," a burden not met by a "showing that the defendant merely associated with those participating in a conspiracy." *Jackson*, 700 F.2d at 185 (citations omitted).

Here the evidence amply demonstrated the existence of the charged conspiracy respecting the marihuana in the van. The crucial question is whether it showed that Ponce was a member of that conspiracy. We hold that it did not.

Evidence that could be viewed as implicating Ponce included: the presence in the motel parking lot of a truck outfitted to carry and pump aviation fuel, and evidence that the truck's chain of title was similar to that of the abandoned van; a scrap of paper taken from Basey containing the name "Danielle Ann Fields," and Ponce's possession of phone numbers for Basey, Lopez, and Fields and an address for the latter; Basey's telephone book listing, *inter alia*, "Armando Lopez," with whom Ponce was arrested; Ponce's presence in a motel room rented in another's name, which contained aviation charts and a list of radio frequencies indicating a flight path between Fort Worth and an area in Mexico, as well as small quantities of controlled substances. Although this evidence tends to connect the motel room to events in Burnet County and supports the inference that one or more people associated with the room at one time or another participated in the marihuana conspiracy, the critical missing element of proof is some adequate indication that Ponce was ever aware of the existence of the conspiracy or intentionally joined it.

The only physical evidence found in the room directly linked to Ponce were the telephone numbers in his possession and the approximately $1,000 in $10 and $20

bills found in his clothing; all other evidence was at best merely near him or in the same room. There was no showing that the marihuana found in the motel room was similar to that found in the van. Ponce made no self-incriminating statements and demonstrated no guilty knowledge of events in Burnet County.[40]

Although the question is extremely close, we conclude that the evidence against Ponce was inadequate to establish his knowing and intentional joinder in the conspiracy, *cf. Stanley, supra,* at 1243–44,[41] and that his conspiracy conviction must be reversed.

### 4. Denial of Ponce's Motion for Severance

Ponce also contends that the district court erred in denying his motion for relief from prejudicial joinder on the theory that his defense was prejudiced by the introduction of incriminating statements admissible against his nontestifying codefendants, Basey and Lopez, but, he contends, inadmissible against him.

Ponce complains of Basey's statements to Agent Pena about the general operations of the marihuana trafficking organization (most pointedly Basey's statement that the conspiracy involved a ground crew of seven or eight people) and Lopez' question ("How did you find *us?*"), suggesting Ponce's involvement in the conspiracy, as well as Lopez' comment ("That figures"), which demonstrated Lopez' lack of surprise that he was found through Basey. While the district court admitted these declarations only against the respective declarant-defendants, and clearly instructed the jury that they could not be considered for any purpose against Ponce, Ponce nevertheless asserts that reversal is required under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

As we have reversed Ponce's conspiracy conviction for insufficient evidence, we

---

**40.** In its jury instructions, the district court charged the jury not to consider Lopez' statements—"How did you find us?" and "That figures"—as evidence against any defendant except Lopez. Consequently, in reviewing the sufficiency of evidence against Ponce, we cannot consider these statements as evidence upon which the jury could properly have relied in finding that Ponce knew of or participated in the conspiracy. As the district court correctly concluded, these statements were plainly admissible against their makers. *See* Fed.R.Evid., Rule 801(d)(2)(A) (admission of a party opponent is not hearsay as to that party). Equally plainly, Lopez' statements were not made during and in furtherance of the conspiracy and were not admissible against coconspirators under the hearsay exception provided for in Rule 801(d)(2)(E).

We are not called upon to decide whether Lopez' above-referenced statements would have been admissible against Basey and Ponce under recognized exceptions to the hearsay rule for excited utterance (Rule 803(3)) and statements against interest (Rule 804(b)(3)). In *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Court recognized that admission of statements by nontestifying coconspirators within Rule 801(d)(2)(E) without a showing of the declarant's unavailability did not violate the Sixth Amendment's confrontation clause. In *Lee v. Illinois,* —— U.S. ——, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), the Court held that the confrontation clause barred admission of a nontestifying codefendant's station house confession implicating the defendant where the circumstances provided insufficient indicia of reliability. In *Lee* the Court stated that the "declaration against penal interest" concept "defines too large a class for meaningful Confrontation Clause analysis." *Id.* at 2064 n. 5. Given the differing circumstances here—particularly that Lopez' statements were spontaneous and not in response to questioning and are not reflective of any motive on Lopez' part "to gain by inculpating another" (*Lee* at 2062)—we observe that it is certainly arguable that *Lee* would not bar the use of Lopez' referenced statements against Ponce.

**41.** In *Stanley,* we reversed the conspiracy conviction of defendant Leake on evidentiary insufficiency after concluding that conspirators' statements were inadmissible against him. *Id.* at 1243 ("Stripped of any reliance upon the other defendants' statements ..., the evidence at best showed only that Leake was in the hotel room ... when the agents ... returned to make the arrest."). In *Stanley,* Leake's name was listed in the conspirators' address books, papers found on Leake listed the numbers of hotel rooms used in the conspiracy, and the government argued that telephone records indicated some prior contact between Leake and the conspirators. Noting the importance of "what the evidence did not show," we concluded that "the jury could not reasonably find that [the defendant] had the deliberate, knowing and specific intent to join the conspiracy charged in the indictment." *Id.* at 1244. *Stanley* controls us here.

need not consider whether these circumstances required a separate trial as to that count. We regard the statements Ponce challenges as sufficiently unrelated to the possession count as to not mandate reversal of his conviction on that count in any event.

### C. Lopez' Contentions on Appeal

Lopez raises two issues on appeal: (1) that admitting Basey's statements violated the Sixth Amendment because Basey was a nontestifying codefendant and his statements implicated Lopez; and (2) that the evidence was insufficient to support his conspiracy conviction. We address these points in turn.

### 1. Denial of Lopez' Motion for Relief from Prejudicial Joinder

Like Ponce, Lopez contends that the district court erred in denying his motion for relief from prejudicial joinder on the theory that his defense was prejudiced by the introduction of incriminating statements admissible against a nontestifying codefendant, but inadmissible against him. Lopez complains that admitting Basey's statements about the trafficking organization into evidence in their joint trial was so prejudicial to him that a fair trial was impossible, notwithstanding that the trial court admitted the statements only as against Basey and instructed the jury they could not be considered against Lopez (or Ponce).

If joinder was initially proper [42] but a joint trial might be prejudicial to one defendant, the defendant can request relief from joinder, Rule 14, Fed.R.Crim.P.; see also United States v. Harrelson, 754 F.2d 1153, 1219 (5th Cir.1985) (discussing Rule 14 relief), cert. denied, —— U.S. ——, ——, 106 S.Ct. 277, 599, 88 L.Ed.2d 241, 578 (1985). A district court's denial of a Rule 14 motion is reviewed under the abuse of discretion standard, id. at 1219, and a party whose motion was denied can prevail on appeal only on a showing of specific and compelling prejudice, against which the district court was unable to provide protection (with, e.g., limiting instructions), and, then, only if the possible prejudice outweighs the public interest in the economy of judicial administration. United States v. Acosta, 763 F.2d 671, 697 (5th Cir.), cert. denied, —— U.S. ——, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985); Harrelson, supra, at 1174–76. Compelling prejudice requiring separate trials may arise if one defendant who does not testify—and consequently cannot be cross-examined—has incriminated a codefendant in statements which are offered in evidence at trial.

Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), held that the admission of incriminating nontestimonial statements made by one defendant, unavailable for cross-examination at trial, created a substantial risk of prejudice to the nondeclarant codefendant, because the jury might—despite limiting instructions to the contrary—consider them against the nondeclarant.[43] Bruton indicates that refusing to admit the codefendant's inadmissible hearsay statements or a separate trial is required in such cases because of the Sixth Amendment confrontation clause.

---

**42.** The propriety of joining the trials of different defendants charged together, see Fed.R.Crim.P. 8(b) (joining defendants in single indictment permitted for defendants charged together on offenses arising from the same act or series of transactions), is judged from the face of the indictment, taking its allegations as true, United States v. Merida, 765 F.2d 1205, 1218 (5th Cir. 1985). "It is the general rule that persons who are indicted together should be tried together," even if there is a disparity in the quantum of evidence against each. United States v. Harrelson, 754 F.2d 1153, 1174–75 (5th Cir.1985), cert. denied, —— U.S. ——, ——, 106 S.Ct. 277, 599, 88 L.Ed.2d 241, 578 (1985).

**43.** Severance of defendants because of prejudicial joinder is designed to guard against "a defendant having to face what amounts to two prosecutors—the state and his co-defendant" or "a situation in which each defendant is the government's best witness against the other," but severance is not required if such evidence would nevertheless have been admissible against the defendant seeking severance if the severance were granted. United States v. Lee, 744 F.2d 1124, 1126–27 (5th Cir.1984). The Bruton rule therefore applies when a codefendant's statement is inadmissible as to the defendant seeking the severance.

A critical consideration in *Bruton* claims is whether the out-of-court statement at issue clearly implicates the codefendant; if the statement does not do so, no serious *Bruton* issue is presented.[44] Even if a statement is admitted in violation of the *Bruton* principle, the error may be harmless if the statement's impact is insignificant in light of the weight of other evidence against the defendant. *See Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972).

■ We hold that Lopez was not unfairly prejudiced by the limited admission of Basey's statements. First, none of Basey's statements admitted at trial implicate Lopez (or Ponce) in any way, directly or indirectly. Second, to the extent that Basey's statements evidence the existence of a conspiracy involving several members, physical evidence from Burnet County fully demonstrated the existence and multiparticipant nature of the conspiracy wholly apart from any statements of Basey. Accordingly, we conclude that the trial court's instructions were adequate to prevent use of Basey's statements against Lopez (and Ponce), that no *Bruton* prejudice arose from the limited admission of these statements, and that the district court did not abuse its discretion in denying severance.

### 2. Sufficiency of the Evidence on the Conspiracy Count

■ Lopez claims that the evidence against him on the conspiracy count was insufficient. We observe at the outset that all evidence considered in weighing Ponce's similar claim, as discussed above, is also relevant to Lopez' sufficiency challenge.

Lopez' position is far weaker than Ponce's, largely because Lopez' volunteered question and comment, together with his sudden interest in the television news report of the van's discovery, offered the jury ample evidence of his guilty knowledge and consciousness of guilt about Basey's criminal activities and events the previous night in Burnet County.[45] Together with all the physical evidence in the room, Lopez' question and interest in the news report allowed the jury to infer with confidence that he knew of the conspiracy and had some role in it. We also view Lopez' lack of surprise about being arrested because of his connections with Basey as evidence the jury could consider highly

**44.** In *United States v. Hicks,* 524 F.2d 1001, 1003 (5th Cir.1975), *cert. denied,* 424 U.S. 946, 96 S.Ct. 1417, 47 L.Ed.2d 353, 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 197 (1976), we held that a statement suggesting that four people were involved in a crime did not raise *Bruton* concerns:

"Application of the *Bruton* rule ... requires a more discriminating approach than exclusion of all out of court confessions by co-defendants. Courts must exclude these confessions *only when they directly inculpate the complaining co-defendants,* as well as the declarant." (Citing cases; emphasis added.)

*See also United States v. Coppola,* 788 F.2d 303, 305–06 (5th Cir.1986) (citing and quoting *Hicks, supra,* and other cases involving codefendant statements found admissible in joint trials without violating *Bruton* because the statements did not clearly implicate the complaining defendant); *Clark v. Maggio,* 737 F.2d 471, 476–77 (5th Cir.1984) ("We have held that a codefendant's statement that the proceeds of a crime were divided among a specific number of people does not violate *Bruton.*"), *cert. denied,* 470 U.S. 1055, 105 S.Ct. 1761, 84 L.Ed.2d 823 (1985); *United States v. Webster,* 734 F.2d 1048, 1054 n. 6 (5th Cir.1984) (stating "the *Bruton* rule is not violated unless a codefendant's statement directly alludes to the complaining defendant," "even if the evidence makes it apparent that the defendant was implicated by some indirect references"; citing cases), *cert. denied,* 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1985); *United States v. Warren,* 578 F.2d 1058, 1075 n. 15 (5th Cir.1978) (weighing degree to which statement implicated defendant and whether statement was crucial to government's case), *rev'd in part on other grounds,* 612 F.2d 887 (5th Cir.) (en banc), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).

**45.** *See United States v. Kalish,* 690 F.2d 1144, 1155–57 (5th Cir.1982) (citing cases on and discussing consciousness of guilt evidence), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); *United States v. Brown,* 604 F.2d 347, 351 & n. 2 (5th Cir.1979) (acknowledging right of jury to infer admissions from a defendant's words and conduct), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980). *See also United States v. Young,* 745 F.2d 733, 763 (2d Cir.1984) (conspirator's initial reaction to search of accomplice's apartment—"speculating as to which of his actions had prompted the search"—supported inference of guilty knowledge of conspiracy), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Gordon,* 712 F.2d 110, 114 (5th Cir. 1983).

probative on the question of whether Lopez knowingly participated in the conspiracy. We conclude that Lopez' words and conduct provided the vital probative link between Lopez and the specific conspiracy offense with which he was charged, the connection not adequately shown in the case against Ponce. We therefore determine that sufficient evidence supports the jury's verdict as to Lopez.

### IV.

Accordingly, the convictions and sentences of appellants Basey and Lopez are in all things affirmed. As to appellant Ponce, his possession conviction and sentence are affirmed, and his conspiracy conviction and sentence are reversed.

AFFIRMED as to Basey and Lopez; AFFIRMED in part and REVERSED in part as to Ponce.

ROBERT MADDEN HILL, Circuit Judge, concurring in part, dissenting in part.

I concur with all aspects of the majority's fine opinion except one—the reversal of the conviction of Ponce on the conspiracy count while affirming the conviction of Lopez on the conspiracy count. The evidence cited by the majority as implicating Ponce in the conspiracy, majority opinion at 1001–02 is exactly the same as that used to convict Lopez except for two factors. In Lopez' case he inquired of the officers how they had discovered them, and when told how he did not act surprised. Also, when a news report of the van's discovery came on the television, Lopez expressed an interest in it. The majority holds that these factors provided the "vital probative link between Lopez and the specific conspiracy offense with which he was charged," and since these facts were not shown in the case against Ponce, he could not be convicted of conspiracy. I do not believe that these two factors, given all the other evidence tying Lopez and Ponce to the conspiracy, amount to a distinction that makes a difference.

The standard of review of a sufficiency of the evidence question is that we must view the evidence and inferences that can be drawn therefrom, and accept all credibility determinations, in the light most favorable to the jury verdict, and then determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Saenz*, 747 F.2d 930, 935, 936 (5th Cir. 1984), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985). I believe that under this standard of review Ponce's conviction on the conspiracy count must be affirmed. Just because Ponce did not show any interest in the news report and did not make any statements as to how they were discovered is not a sufficient difference for this court on review to decide that a reasonable trier of fact could not find him guilty. Such a decision takes the fact finding out of the hands of the jury and places it in the control of an appellate court.

For these reasons, I respectfully dissent from this part of the majority's opinion.